Good morning ladies and gentlemen. Our first case for this morning is Boucher against United States Department of Agriculture. Mr. Cooley. Thank you. May it please the court, I'm Michael Cooley and I'm here on behalf of Rita Boucher who appeals a wetland determination entered under the swamp buster provisions of the Department of Agriculture. The Department of Agriculture actually has its origins back in 2003 when the NRCS, the National Resource Conservation Services, entered a preliminary technical determination that fields UN1 and UN2, and for our purposes today the issues regarding both of those fields are the same, so I'll either just refer to the fields or the property. Those fields were determined to be converted wetlands in 1994 when Mrs. Boucher's husband removed nine trees from the sum total of 2.6 acres of farmland. That preliminary technical determination was appealed by Mr. Boucher, but the NRCS never acted on the appeal, and in 2013 realized that hole in their records and went out and reviewed the property and made that technical determination final. Ms. Boucher appealed that decision through the National Appeals Division of the USDA, a that brought us here today. The relevant provisions that we're dealing with are the swamp buster provisions again of the Food and Security Act, and what those provisions require, there are three requirements. In order to be a wetland, as of December 23rd, 1985, the fields had to have hydric soils, they had to have requisite hydrology, and they had to have hydrophytic vegetation. The hydrology had to support the vegetation. So here's my basic English question. What does the word hydrology mean in this context? Well, it is set out in the statute... It sounds like the science of water. In a way, it really, I think, is intended to have a more common-sense definition. By statute, it is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions. So essentially, it's got to be muddy ground, ground that holds water most of the year, and can support hydrophytic vegetation. Which certainly reveals that even though these are separate requirements, they're interrelated. So, as you just said, the saturation or inundation or the presence of water needs to support the hydrophytic vegetation, even though the hydrophytic vegetation is a separate requirement. Correct. It would be possible to have any of the requirements and not a third, and the property would not be a wetland in that case. But the thing is, if... Let's take a hypothetical, not your case. Let's just take a hypothetical where there's a field where somebody, you know, builds a wall around it and installs a pump and pumps all the water out of the field. And then, sometime later, someone wants to see, is this a converted wetland? Well, at that phase three criteria, it's not going to have either the hydrology or the hydrophytic vegetation, because somebody pumped all the water out. So the vegetation isn't going to be there, nor is the water going to be there. So in this backward look, we need to reconstruct the whole picture, not just soil or not just vegetation. See what I mean? You know, it's... Once you've dried it out, the points on that, the vegetation in this case are trees, and those trees are not, would not die out. There's no evidence... No, I don't think that's right at all. I mean, the things that were removed were the trees, but the capability of the area defined to support hydrophytic vegetation is a broader criterion than any particular plant that happens to be growing there on any day. Correct. I think that there is no dispute... That's defined as plants growing in water or in a substrate that is at least periodically deficient in oxygen as a result of excessive water content. Correct. That's true, but those plants can't exist absent hydrology, especially trees, which bring us back to this case. Well, but the reason I'm pushing is because, as I see your case, you please correct me if I'm wrong, but your big complaint seems to be the decision of the USDA to assess what your parcel, these two parcels, UN-1 and UN-2, or however you're calling them, their decision to look at the comparator field 7 to see what UN-1 and UN-2 were like in 1994. Yes, the big complaint here, and going, and the second point with respect to your hypothetical from earlier, is that if that water pumping occurred prior to December 23rd, 1985, then we don't have a way... No, I understand that, but I'm gonna assume it was afterwards. It was, you know, in 1990, you know, some year, because I don't, I know one of your arguments is dealing with the tile, that maybe this was before 1994, but I understand the director's decision to be based on the comparison to field 7 and the removal of these nine trees. Correct, and I think that our position here is that the use of the comparison site was governed by the findings of the National Resource Conservation Service's scientists that were on site, and those scientists determined that they could not determine hydrology on site because the field had been drained. Right. Okay, and so... And that's a kind of, it's a typical type of determination they would make, isn't it? It is. Whether they were right or not on your field is a different question, but that's their job. Exactly, that's their job, and their job is to determine whether they can, on site, determine whether there are hydric soils, whether there's hydrology, and whether there is hydrophytic vegetation. If they cannot make one of those determinations on site, then they must state why, and then they may go use a comparison site to determine what would have existed if the conversion had not taken place. There's no real question here that vegetation was removed from the site, but there is a big issue as to whether hydrology was removed from the site, because Ms. Boucher, before the National Appeals Division hearing took place, had the site trenched to a depth of five and a half feet. There was no freestanding water, and there was no tile located on the site. So the NRCS, the decision to say that site has been drained. And drainage means something very specific to these scientists, because they use the Army Corps of Engineers Wetland Delineation Manual, and it says hydrological alterations are dams, levees, ditching, filling of channels, diversion of water, groundwater extraction, and channelization. So drainage would be among those. Tree removal would not. Well, except we have, you know, in the supplemental authority we had on the 18th of September last week, converted wetland includes something where woody hydrophytic vegetation has been removed from hydric soils for the purpose of or permitting the production of an agricultural commodity. So you think that just doesn't apply to you? I think that if you read the first line of that, it says a wetland is a converted wetland, so it must be a wetland before it can be converted. And... So let me try to get at it this way, Mr. Cooley. What does the record tell us about the species of trees that were removed by Mr. Boucher in 1994? That is not really part of the record. The only pictures of these trees are in your supplemental appendix beginning at page 136. You can see tree slides. These are overhead views from about when the conservation officer determined that they were wetland trees. There is not necessarily... I believe there were some suggestions... Those spinoak should begin at one... Yes, those. They were in color when they were uploaded, but yes. We'll ask Mr. Wood about that as well. But if you go from 136 to I think 152, those are the slides beginning in 1985 and should take you through 1994, maybe even 1998. I mean, to be honest, these are not that illuminating. Well, that's what I mean. That's what they were looking at to determine what kind of trees were there. But the fact is, you make a statement in your brief that bothered me a little bit. You said, oh, you know, obviously trees are going to be... They'll use water, and so if you remove trees, there'll be more water, not less. But I think that's A, not necessarily true, and B, a scientific assumption that it seems to me you would need expert evidence to support. Precisely, Judge. And the department had its experts look at this and conclude on the basis of the comparison to Field 7, which they found to be comparable to UN 1 and 2. They find that it is something that changes things. I mean, think of the Amazon. I mean, the fact that trees are there doesn't mean that there can't be a lot of water. I agree with you. I don't dispute that there would be cases in which removing all... You know, if you had a forest and you removed 50 trees from a 75-tree forest, it could be possible that those trees were actually impeding the flow of water. Well, and it could also be possible that the overall effect of the trees is causing it to be a more watery environment, if I can say. Removing trees can lead to desertification. It's a significant thing to do. It can, but in this case, that's not what the experts said or found. They found that the site had been drained. In fact, on appeal, in the record of the appeal hearing before the National Appeals Division, when the experts were confronted with the fact that these fields had been ditched and that there was no tile I mean, I think the government has abandoned anything having to do with tile. Your opening brief is all about tile, so I was expecting them to talk about tile, but they said, no, you know, look at these places and the director's findings, and the director says, never mind, we were wrong about the tile, but there are other problems. It's the trees. Correct, but again, then we go back to, if it wasn't tile, if it was not what the experts said it was when they were there, if they find it's not tile, then we believe that both, specifically the statute, the provisions of the statute, require them to go back and make an independent determination as to whether hydrology had been removed from the site in some different way. Well, what's wrong with their finding that it was the removal of the trees? Well, that was not the finding of the technical experts that were on the site. But it moves up through the agency, though, for quite a long time after that. It does, but the evidence has said. Do you think agencies can't adjust to additional information? I don't think they can when their scientists are the ones who provide the baseline for the determination. Agencies also sometimes rationalize sticking to an initial mistake when the facts change on them. Could I ask you, Mr. Cooley, just to tell us what's at stake here? This is a longstanding fight over a couple of acres. What's going on? I mean, what's at stake here for Mrs. Boucher is essentially, one, these fields cannot be farmed in their present state by an operator who can receive government benefits. The two and a half acres? Yeah, 2.6 acres, correct. 2.6, okay. And she had a prior operator that farmed these farms that the government did seek recompense from. And she has taken this field in part on his behalf. Does this affect potential for real estate development? It affects her ability to sell the property and have the property be farmed. My understanding of federal law is that if these farms were sold, to be developed as real estate, then there would have to be a separate determination under the Clean Water Act. Okay, thank you. So if you'd like to save rebuttal time, you can. Looks like you're weighing in. Yes, I would like to save the last couple of minutes for rebuttal, please. Fine. Thank you. Mr. Wood. Your Honor, may it please the Court, Bob Wood on behalf of the USDA. This case on substance is a slam dunk, I think you're missing a lamp a couple of times. I'm not so sure about your first point. Sure, well, I'll start with that then, Your Honor. As the National Appeals Division Director cited, 7 CFR 12.32A provides for a two-factor determination, essentially. That's in the supplemental authority. Right, so what's the evidence that the vegetation that was removed was hydrophytic? It's mostly the aerial photography and some references in the 1987 notice that was given to Mr. Boucher of potential wetlands. That covered more broadly the property and not specifically these small parcels, but the expertise was that they were pin oaks and red oaks, which are wetland trees. On the way that the agency supported its decision through the appeal process, we have these technical documents, the form threes that are kind of hard to suss out for lay people, and then we have the explanations given during the appeal process. Oaks are not mentioned, I will acknowledge that. But the agency experts looked at these pictures and said those are pin oaks and red oaks? Yes, and they assure me that they are capable of doing that. That's all I can stand on is their technical expertise. But for that inference, the agency's chain of logic seems circular. Unless it was, quote, hydrophytic vegetation that was removed, and by the way, it was because the agency dropped the ball for nine or 10 years that the person who removed them was no longer available to testify. Sure. I think that's all well and good. My best response to that, I think, is the interlocking nature of the various requirements under the statute in the C.E.V.R., which is that if you have these hydric soils, which are saturated and show calcium and other mineral deposits and oxidation, then... And I take it that factor is not disputed here? It is not in dispute. So they are hydric soils. There also has never been a dispute as to whether or not the trees that were removed were hydrophytic vegetation. So no one ever contested that? That hasn't been disputed? It was not disputed at the district court. All along, and there are several references in the USDA's brief, Ms. Boucher has conceded that essentially that the tree removal piece was met, which is the woody vegetation. Woody vegetation is the 7 C.F.R. No, hydrophytic vegetation. And you have shifted the phrasing. That's fair. I'm referring to the language... And so has the agency. I'm referring to the language in... Yeah, sorry, it's woody hydrophytic vegetation. I'm just being imprecise. But I do not understand the hydrophytic nature of the plants to have ever been in dispute. I understand that the dispute rested predominantly on the hydrology findings vis-a-vis process. Is there a list of hydrophytic trees in the agency's view? Yes, there is a reference list that they relied on. I don't have that to hand. I apologize. But they have a list. A quick reference would be... Is it in a manual or in code? It's in the field manuals, but there's also a national list. Some of the ones that they relied on, of course, from the comparison site are listed in the documents. I'm not very interested in the comparison site. The question is, what was in the UN1 and UN2 fields? Sure. Because the rationale for doing the comparison site has disappeared. The belief that those fields had been drained. Cleared and drained. The reference in the underlying documents is on page... So the SEPAP 51 and 53 is that a comparison site was used for hydrology and hydrophytic vegetation because the sites were cleared and drained. Cleared of nine trees. Yes. Nine trees and two and a half acres. You could fit nine trees pretty comfortably in this courtroom, which is a small fraction of an acre. I agree. I would also say on that note that your Honor's question about what's at stake here, this requires going just a little bit outside the record, but there's no indication that USDA is seeking any past benefits. From Ms. Boucher or anybody else? Or anybody else. In large part because of, I think, bashfulness over the delays in the process. Also, throughout the appeal process, since the appeal process started, I understand that there have been either attempts or starts and certainly plans to mitigate the wetlands and farm the land. And USDA has no problem with that. What does that mean? That you can repair other wetlands. So you swap, basically. And you get a credit. I'm not sure where the CFO... On some other wetland a fix. Expand field seven a little bit, which is the low spot, field seven. Sorry? Expand field seven, which I think everybody agrees is a real wetland. I believe so. To give Ms. Boucher's position credit, throughout the underlying administrative process she contested that, but she's dropped that. And again, I would also say that although I don't have a better answer as to specific evidence that this was woody hydrophytic vegetation, I do not understand that as being something that was pointed up to the director as needing a specific determination. Well, given the way rationales have been shifting though along the way, I'm not sure there was a need to. Well, that's fair. But also, even though the rationales shifted, there's an important distinction to be made. The rationale for the conversion has never changed. The conversion has always been tied to the removal of traits. That has never changed. There's a separate decision, which is the justification for the comparison site. That rationale has shifted. Well, the tiles were in there at some point, and then they disappeared. Yes. So the rationale was given in multiple places. The site has been cleared and drained, which is sort of a dual justification for dual-use comparison site. And then references to the atypical situation portions of the Army Corps manual on the atypical situation data sheet point to all the manual citations that the USDA has provided in its brief. So the conversion decision has never shifted. During the appeal process, acknowledging that Ms. Boucher did a full trenching of the property that showed no tiles, rather than trying to explain that away in some sense, the Conservation Service said, agreed, will concede that there are no tiles. And the significance of that is that tiles weren't used to drain it. That's correct. And we still have undisputed hydric soils. We still have the removal of these trees, which are documented throughout the underlying documentation. And we tied them, however obscurely, to the use of the comparison site. Let us be fully clear now that the only support we have for the use of a hydrology comparison site, Field 7, is the removal of trees. And can I just say, it seems to me, from the government's point of view, this case rises or falls on whether your use of the comparison site can be justified under the relevant laws and regulations. Because I don't see anything else in this record that would independently support a finding that at the critical time, this was wetland. Well, I don't agree with that, Your Honor. Under 7 CFR 12.32a, the use of a hydrology comparison site was not necessary. And the manuals speak to this, too. If you go to page 119 of the regional supplement, there's no need for a drought or any other, or even for hydrology to be present. What is needed to make a wetland determination, at least under this manual, and as I understand it, there's no direct challenge to the manual as inconsistent with the statute, at least other than in the reply brief. It says, first step, verify that indicators of hydrophytic vegetation and hydric soil are present or are absent due to disturbance or other problem situations. If so, proceed to step two. And then it carries on to step three. And step three is under step 3D, the field experts would use a reference site for hydrology. So that is important to the process point, I acknowledge, Your Honor. But under 12.32a, all that is needed is the removal of woody hydrophytic vegetation and hydric soil and farming. It's different than the regular three factors. It's an interpretive regulation. It hasn't been challenged in this process, even though it was a principal basis for the National Appeal Division Director's decision. And with that, the comparison site issue falls away because there's no need for a hydrology comparison site. And I think the reason for that is that, as I understand from the Conservation Service people and the USDA people, removal of trees is the mine run of conversion cases. Tree removal is why this is, in large part, why these wetland conservation— Is one tree enough? The statutes does not use—and the regulations do not use the plural. And that is— It uses the collective. It uses the collective. But again, it does use the word area in tying the determination in each sense. And so let's say you have a small plot of land, an acre or half acre, next to a farm, and you decide you want to farm, and there are hydric soils in the area. There have to be hydric soils, which show that it's been saturated in the past, for sure. And you have one tree surrounded by— One hydrophytic tree. One hydrophytic tree, of course. One pin oak. One pin oak surrounded by— Then the determination of what part of that half acre cannot be farmed is based on the presence of the hydric soil in tandem with the tree. So it may be that one—what would that be? One five-thousandth of an acre, to just use numbers cited in the footnote, and the reply may not be farmable. So here we have nine five-thousandths? Yeah, well, I think that the—I can't remember if it was one ten-thousandth or one something. It is a small area, but, again, so is the area that has been subject to this determination. Mr. Wood, as you might know, this court gets exposed to a lot of jargon in briefing. This seemed to be a particularly rich example in this case. Could you explain what is meant by the term FAC neutral test? Yes. An FAC neutral test, you know, the best explanation of that comes actually in the reply brief. An FAC neutral test is a test designed to assess the interaction between plant life and the surface structure of the soil. What does FAC stand for? I'm going to just say, while you're looking for it, I thought this brief was a great candidate for something I've advocated for a while, and that is to say a glossary, because I had the same problem Judge Hamilton did, trying to figure out FAC neutral, you know, is this like a car? A geomorphic position? I think that means— That just means the levels.  There's an easier way to explain that. A glossary or a better language. Hydrology means the presence of water rather than the study of water here, or what? It's the presence of water at some point. A history of water? It may be past. It sounds like it's a very badly drafted everything, because if it's really the hydrologic properties of the area, it seems to me you could almost have a sensible sentence that said that, but where's the water seems to be your definition. Let me ask it this way. Let me ask you the same question about the stakes. If we were to find that in this particular case, given the agencies having dropped the ball, which leaves for almost 10 years, which left Mrs. Boucher without a living husband who could answer the questions about what had been there, if we were to find that this particular decision was arbitrary and capricious, what consequences would that have for soil conservation programs? I think that depends on the narrowness of the decision. If the decision was based on Your Honor's point that there may be insufficient evidence of the hydrophytic nature of these trees, that strikes me as being an extremely narrow decision. I don't want to overstep, because I'm not a technical expert, but I have not seen anything that would indicate that that would be a far-reaching decision. On the other hand, if the decision is that the lack of hydrology drives, the lack of water inundation drives the bus, then that would require, as I read it, some sort of repudiation of 7 CFR 12.32A, which does not require hydrology. That, I believe, would be a far-reaching decision, at least vis-a-vis the implementing regulations for the statute. Thank you. That's helpful. Mr. Woodman, may I ask just one question? I want to understand how much reliance you have on the amount of trees that were removed. The decision is based solely on tree removal, and the quantity of the trees has never, other than rhetorically, I think, been that consistently. What concerns me is that the June 2013 hearing, the NRCS representative Mary Jo Woodruff testified. I do want to point out that tree removal, it doesn't matter how much, but it does constitute a hydrological alteration, and it is in the Food Security Act that it is an alteration. So is it a position, then, that a single tree could justify the agency finding here? I believe that is the agency's interpretation. I have not seen anything contrary, and that is how I would read the implementing regulations. I would also just add, with the court's permission, that what she may have been referring to is that when you remove trees, the alteration is often not the Amazonian aspects of water flow, but when heavy equipment is brought in to remove trees, the conservation service is therefore unable to make hydrology findings to undertake their measurements. And she may have been referring to the removal of a tree justifying the comparison site in that sense. But insofar as the basic element of your question, can a conversion decision be based on the removal of one tree from hydric soil, I'm not aware of that ever happening. Does it matter how big the parcel is? I mean, a quarter-acre parcel, a 500-acre parcel, is there some standardization for that? I think it's only the common-sense limits of commercial farming. This is related to commercial farming, and obviously these fields get defined within the process. It's not as though my understanding isn't that the UN1 was for tomatoes and UN2 was for onions and the giant rest of it was for soybeans. It is that these definitions arose as a result of these are the areas with hydric soil that had trees in them based on the photographic evidence. And I would, again, just to pivot briefly, the existence of hydrophytic, whether or not those are hydrophytic trees, I think it is fair to say that deferring to the agency experts is appropriate. One last question, if I could, Mr. Wood. I want to follow up on the passage of the testimony in the hearing that Judge Flom quoted. Which provision is it in the Food Security Act that says, in essence, the removal of one tree is a hydrological alteration? It is just the non-plural. It's that woody vegetation or woody hydrophytic vegetation, as it's used in the statute and the regulations, is not clearly plural. That's the only indication. Okay. That's the best I've got. Okay, thank you. Thank you. All right. Thank you very much. Anything further, Mr. Cooley? Yes, thank you, Your Honor. The first thing that I want to say in rebuttal is, counsel pointed out the language of the final technical determination, red crops, red clearing and drainage as being mutual in the entries made by the experts, but it was not. I mean, the entry made for drainage in the final technical determination actually says hydrology. Drainage tile has been added to the site. Hydrology data from comparison site field seven. That is their finding as to hydrology. Down at the bottom, they combine their remarks and say, we find that they've been cleared and cropped and drained, and therefore we had to use a comparison site for it to determine vegetation and hydrology. But under drainage, it does not say drained and cropped. It says drained. Did you dispute in the agency or the district court whether the trees that were removed were hydrophytic? We did, Your Honor, and if you look at page 404 of the administrative record, there is a letter in the file from David Boucher to his attorney at the time, and that letter says the trees that I removed were faculty of upland trees, which are non-wetland trees. I was not attempting to violate wetland and based on the type of trees, and I'm expounding a little bit on what he was inferring there. That's the logic. But he was telling his lawyer at that point in time, I did not remove wetland trees, and if I thought I was, I would have called because the voucher is always called. So you can find that at page 404 of the administrative record. The other couple of points I wanted to make, we talked about CFR 12.31b2.2, but actually the preceding section, 12.31b2.1, actually refers to the hydrology component. It refers to soil and hydrology normally present without regard to whether vegetation has been removed. That is the hydrology component set out separately in the Code of Federal Regulations. The sections cited by counsel in his supplemental authority were actually specifically with respect to vegetation without regard to hydrology, but the preceding section actually covers hydrology, and I see that my time has expired. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement. Thank you.